**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| SUMMIT TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>E.L. BLAKE, INC.; and<br>ERNEST C. COLEMAN,<br><br>Defendants. | ) | Case No. ___________________ |

**COMPLAINT**

Plaintiff, Summit Technologies, Inc. ("Summit" or "Plaintiff"), by and through its undersigned counsel, hereby demands judgment against E.L. Blake, Inc. ("ELB") and Ernest C. Coleman ("Coleman," collectively with ELB, "Defendants") in the amounts and/or for the relief set forth below, and for its Complaint states as follows:

**NATURE OF THE CASE**

1. This action arises from Summit and ELB's relationship as joint venture members (the "Members") in ELB Services LLC ("ELBS" or the "Joint Venture"), an Alabama limited liability company and unpopulated joint venture (i.e., a joint venture entity that does not have its own employees and instead relies on the employees of its member companies to perform contract work).

2. Through Defendants ELB and Coleman's mismanagement of the Joint Venture and other wrongful acts, Defendants have breached the Joint Venture Operating Agreement ("JVOA"), breached their fiduciary duties, and violated the Alabama Limited Liability Company Act ("LLC Act"), thus damaging Summit as the minority member of ELBS.

3. As a result of Defendants' wrongful actions, Summit seeks damages, access to ELBS's books and records, a complete accounting of all transactions or records relating to ELBS's operations since January 2025, a declaration of the parties' rights and obligations, an injunction ordering Defendants to act in accordance therewith, and any such further relief as permitted by law.

## PARTIES

4. Summit is a Florida corporation, duly organized and existing under the laws of the State of Florida, with a principal place of business at 118 Pura Vida Court, Panama City Beach, Florida 32413. For subject matter jurisdiction, Summit is a citizen of Florida.

5. Upon information and belief, ELB is a corporation, duly organized and existing under the laws of the State of Alabama, with offices at 1401 Fall Branch Drive, Phenix City, Alabama 36867 and 233 12th Street, Suite 527, Columbus, Georgia 31901. For subject matter jurisdiction, ELB is a citizen of Alabama and/or Georgia.

6. Upon information and belief, Coleman is a resident and citizen of Alabama, with a last known address of 1401 Fall Branch Drive, Phenix City, Alabama 36867.

## JURISDICTION & VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship among the parties, with Plaintiff being a citizen of Florida, Defendant ELB being a citizen of Alabama and/or Georgia, and Defendant Coleman being a citizen of Alabama.

8. Through this action, Summit seeks damages in excess of $75,000.00, exclusive of interest and costs in connection with the misallocation of workshare and other wrongs detailed herein.

9. Additionally, this Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202. Summit seeks declaratory and injunctive relief regarding the parties' respective rights, duties, and obligations under the JVOA and applicable Alabama law, with a value far in excess of $75,000.00.

10. This Court has personal jurisdiction over Defendants in this action because Defendants have purposefully availed themselves of the privilege of conducting activities in the State of Alabama and have sufficient minimum contacts with the State of Alabama such that maintenance of this suit does not offend traditional notions of fair play and substantial justice. Additionally, Plaintiff and Defendants agreed to the exclusive jurisdiction of the state and federal courts within the State of Alabama for resolution of disputes arising from or relating to ELBS's Joint Venture Operating Agreement.

11. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant ELB resides in Phenix City, Alabama, which is in the Middle District of Alabama, and this Court has personal jurisdiction over Defendants as explained above. Additionally, Plaintiff and Defendants agreed to the exclusive venue of the state and federal courts within the State of Alabama for resolution of disputes arising from or relating to ELBS's Joint Venture Operating Agreement.

## STATEMENT OF FACTS

12. Summit is a federal government contractor that provides capabilities development, training support services, mission support services, and information technology to United States government agencies.

13. ELB is a federal government contractor that specializes in business process improvement, management, and technical services for government agencies, including training management through mission planning for United States government agencies.

14. Coleman owns and serves as President and Chief Executive Officer of ELB.

**The Joint Venture and Contract Award**

15. Before the current challenges underpinning this action, Summit enjoyed a close and productive relationship with ELB for many years.

16. Summit and ELB entered into a Mentor-Protégé Agreement ("MPA"), pursuant to the Small Business Administration ("SBA") regulations governing the Mentor Protégé Program, 13 C.F.R. § 128.9, on September 17, 2018.

17. On March 31, 2021, Summit and ELB entered into a joint venture after the SBA approved their MPA, with Summit acting as the mentor and the partner venturer and ELB acting as the protégé and managing venturer.

18. The JVOA created an unpopulated joint venture under the laws of the State of Alabama to bid on and perform service-disabled veteran-owned business ("SDVOSB") set-aside contracts. A true and correct copy of the JVOA is attached hereto as Exhibit A.

19. Under the JVOA, ELB owns 51% of ELBS and Summit owns 49% of ELBS.

20. The JVOA names Coleman, Lisa Coleman, and Joseph Funaro[1] as the three managers on the Joint Venture's management committee.

21. On or about July 22, 2022, the parties executed a contract-specific addendum (the "Addendum") to pursue a SDVOSB set-aside indefinite delivery, indefinite quantity ("IDIQ") contract for mission planning support services (the "Contract") for the Department of the Air Force ("Air Force" or "Agency"). A true and correct copy of the Addendum is attached hereto as Exhibit B.

---

[1] Summit has since replaced Joseph Funaro with William Funaro as Summit's representative on the management committee.

22. The Addendum appointed Coleman as the Joint Venture's responsible manager ("Responsible Manager"), as that term is defined in the JVOA and Addendum.

23. ELBS was awarded the Contract, but ELBS's status as an SDVOSB was protested with the U.S. Small Business Administration ("SBA") and then appealed to SBA's Office of Hearing and Appeals ("OHA").

24. Throughout the protracted protest process, the parties focused on defending the Joint Venture's SDVOSB status and continuing to pursue the Contract award. This included Summit paying almost $275,000.00 in attorney's fees and expenses on behalf of the Joint Venture as a result of the protest.

25. The parties finally were able to begin performance under the Contract in or around April 2025.

26. The Contract's period of performance is for a single twelve-month base year and four twelve-month option years.

27. ELBS has completed the base year and is currently performing the first option year of the Contract.

**<u>Summit's Concerns Regarding ELB and Coleman's Management of ELBS</u>**

28. Since award and Contract performance began, Summit has had ongoing concerns about how ELB, as managing venturer, and Coleman, as Responsible Manager, have managed ELBS and performance of the Contract.

29. ELB has run the contract as if it, rather than ELBS, is the prime contractor. Summit understands and respects that ELB is the managing venturer of ELBS and, according to SBA regulations, must control the day-to-day management and administration of ELBS' performance of the Contract.

30. However, that does not mean that ELB is the prime contractor with unilateral control or that Summit has no rights in ELBS.

31. To the contrary, both the SBA's rules and the JVOA require ELBS to operate as a joint undertaking between ELB and Summit and afford Summit substantial rights.

32. Summit's rights include access to ELBS books and records, signature authority and access to the Joint Venture's bank account, participation in ELBS' communications with the Air Force, and specific workshare on the Contract.

33. To date, ELB, as managing venturer, and Coleman, as Responsible Manager, have repeatedly violated Summit's rights and breached the duties and obligations owed to Summit by failing to: (1) provide transparency into the financials and operations of ELBS, (2) follow SBA regulations regarding the Joint Venture's bank account, (3) provide Summit with access to ELBS's books and records, (4) timely repay a working capital loan of $1.39M that Summit made to ELB between March and May 2025; and (5) abide by the parties' agreed upon work share as reflected in the Addendum.

34. Rather than treating Summit as a partner in and owner of ELBS, ELB and Coleman have disparately treated Summit as a subcontractor that must obey their commands, even when explicitly contrary to the terms of the JVOA and Addendum.

**<u>Summit's Many Attempts at Informal Resolution</u>**

35. Summit has attempted to engage with Coleman and ELB for over a year regarding these ongoing issues within ELBS's operations with minimal progress; to date, informal attempts to resolve these issues have been unsuccessful.

36. At times, ELB and Coleman have recognized and acknowledged that Summit's asserted position is correct and even made promises to take the corrective action requested only to later walk back their admissions and/or not follow through on their promises.

37. These informal attempts at resolution have included Summit calling a members and management committee meeting on April 10, 2026, to discuss the issues outlined above. However, none of the issues were resolved and Coleman continued to stonewall Summit's attempts for resolution in the weeks following the April 10th meeting.

38. After ELB and Coleman failed to follow through with any of the promises made during the April 10th meeting, Summit sent a demand letter ("Demand Letter") to ELB on May 14, 2026, demanding a substantive response by May 22, 2026 and concrete movement on the ongoing issues. A true and correct copy of the Demand Letter and its supporting exhibits is attached hereto as Exhibit C.

39. In response to the Demand Letter, ELB finally provided Summit with *some* of the books and records requested, including copies of the task orders issued to ELBS by the Air Force, more than a year after Summit's first request for such information.

40. ELB also provided Summit with incomplete financial information in unsearchable .pdf form, so that Summit cannot determine how the financial information was generated, what source data supports that financial information, or whether the financial information provided represents a true, accurate or complete financial picture for the Joint Venture.

41. After an initial review of the incomplete financial information, Summit has more questions than answers and has serious concerns regarding ELB and Coleman's financial management of the Joint Venture.

42. For example, based on the final income statement for 2025, period 12 had a net income of $173K, yet for the year it's $170K:

| | 12/01/25<br>12/31/25 | Y-T-D |
|---|---|---|
| **Revenue** | | |
| Government Revenue | [redacted] | |
| **Direct Cost** | | |
| Subcontractor Labor | | |
| Subcontractor Travel | | |
| Other Direct Cost | | |
| Gross Margin | 173,420.00 | 170,038.08 |
| Comprehensive Income | 173,420.00 | 170,038.08 |

43. Additionally, there appeared to be inexplicable transfers of large sums of money from ELBS to ELB, totaling over $4,250,000.00, for which Summit cannot account based on the work the JV was performing at the time. These transfers include the following: $900,000.00 on July 15, 2025; $200,000.00 on September 18, 2025; $1,000,000.00 on October 3, 2025; $150,000.00 on December 23, 2025; $900,000.00 on December 31, 2025; $500,000.00 on January 29, 2026; $200,000.00 on February 4, 2026; and $400,000.00 on February 5, 2026.

44. To date, neither ELB nor Coleman has provided additional insight into or explanation for the discrepancies and other issues Summit has identified in the financial information provided.

45. After exchanging letters, the parties also attempted to address and resolve Summit's various concerns during virtual, face-to-face meetings on June 26, 2026 and June 29, 2026. A true and correct copy of Summit's agenda for those meetings is attached as Exhibit D.

46. While *some* progress was made through these efforts relating to the smaller disputes, only a single issue (i.e., Summit's project manager being added to communications with

the Agency) was resolved and all of the more serious issues (e.g., ELB and Coleman taking Summit's intended work share) remained outstanding.

47. Moreover, immediately prior to these discussions, ELB also notified Summit that it was removing funding for two of Summit's positions on the Contract as of June 15, 2026, and demanding that Summit retroactively return the funding it had received for at least one of these positions dating all the way back to the Contract's start in April 2025, despite Summit performing the work associated with staffing this position. As recently as September 24, 2026, ELB has rejected Summit's invoice billing for the work performed for this position from January 2026-June 15, 2026 in the amount of $52,302.00. For the second position, ELB has assumed responsibility for performing the work without any explanation of funding modifications or impacts to workshare.

48. The parties have met multiple, additional times to attempt to resolve these ongoing issues; however, no material progress has been made.

49. Instead, ELB and Coleman continue to flip-flop and chronically fail to follow through with their promises.

50. On September 24, 2026, ELB rejected Summit's invoice for the Lakenheath Position from March-August 2026, despite Summit actually performing all this work from March to July 21, 2026, and being otherwise contractually entitled to fill the Lakenheath Position for all purposes thereafter. The employee that ELB hired to fill the Lakenheath Position has yet to be rebadged to Summit.

51. Not only has ELB rejected Summit's invoices for positions belonging to Summit (i.e., an FMS e-learning specialist and the Lakenheath Position), but ELB has confirmed that it will not be issuing any mods or payments for services rendered in connection with those positions.

52. Summit has gone to great lengths to address and resolve each of the issues presented here without resorting to court intervention. Unfortunately, Summit has been left with no choice but to file this Complaint to enforce its rights under the JVOA, Addendum, and Alabama law.

53. Between March and May 2025, Summit provided a working capital loan totaling $1,390,000.00 to ELB to fund initial operations under the Contract.

54. Upon information and belief, the parties agreed that ELB would repay the working capital loan from Contract revenues as they were received by ELBS.

55. Summit repeatedly demanded repayment of the working capital loan, including in the May 14, 2026 Demand Letter.

56. Summit brings each of the claims asserted herein as direct claims arising from Defendants' breaches of obligations owed directly to Summit under the JVOA, the Addendum, and applicable law. Summit's claims do not seek recovery for injuries to ELBS as an entity; rather, Summit seeks to vindicate its own contractual and statutory rights as a 49% member of the Joint Venture, including its right to access ELBS's books and records, its right to consent to and approve withdrawals from the Special Bank Account, its right to receive its agreed-upon workshare under the Addendum, and its right to receive the tax and financial information required under the JVOA. These rights are personal to Summit and are independent of any claims that ELBS may have in its own right.

**COUNT I – BREACH OF CONTRACT**
**(Against Defendant ELB)**

57. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 56 above as if set forth herein.

58. On March 31, 2021, Summit and ELB entered into the JVOA, and on July 22, 2022, the parties executed the Addendum to the JVOA for the Contract.

59. Section 9.2.4 of the JVOA states that "[t]he books and records of the Company shall be available for examination and copying by any Member or the Member's duly authorized representative or auditor at all reasonable times during normal business hours."

60. Summit has repeatedly requested access to ELBS records, including task order documents, financial records, and records that would reflect the workshare between the parties and the Joint Venture's subcontractor.

61. Summit reiterated this request for records in an April 14, 2026 email to ELB. A true and correct copy of this April 14th email was attached to the Demand Letter at Exhibit C.

62. Summit has further reiterated its request for access to the Joint Venture's books and records in its May 13th Demand Letter. *See* Ex. C, Demand Letter.

63. As a 49% member of ELBS, Summit is entitled to full access to ELBS's books and records and to inspect and copy such records for purposes reasonably related to its interest as a member.

64. To date, Summit has only been provided partial responses to its repeated requests for access to ELBS's books and records. At times, Mr. Coleman has variously toggled between denying complete access to all requested records outright or suggesting that Summit must come to ELB's physical office location to inspect any records on the premises whenever it wants records access.

65. As of the date of this filing, ELB has only provided incomplete and unusable financial information and the task orders issued to the Joint Venture by the Agency.

66. ELB has not provided complete and usable financial information, including the 2025 K-1s, which has prevented Summit from filing its taxes, the subcontract agreement or task orders issued to the subcontractor working on the Contract, information regarding the Joint Venture's Contractor Performance Assessment Reporting System ("CPARS") scores, invoices submitted to the Agency by ELBS, an unbilled analysis, vendor payments, accounts payable open reports, information regarding the indirect rates and cost allocation structure, and copies of any certificates and reports submitted to the SBA.

67. Under the JVOA, ELB, as managing member of the Joint Venture, has an obligation to make available to Summit the Joint Venture's books and records.

68. ELB has failed to comply with its obligations under Section 9.2.4 of the JVOA.

69. Section 9.3.4 of the JVOA also requires the Joint Venture to provide members with an annual financial statement and tax information necessary for preparing members' federal, state, and local income tax returns within 75 days of the end of each taxable year (i.e., for this year March 16, 2026).

70. As of the date of this filing, approximately six months after March 16th, Defendants have not provided Summit with the necessary tax information.

71. Under the JVOA, ELB, as managing member of the Joint Venture, has an obligation to provide this tax information to Summit by March 16, 2026.

72. ELB has failed to comply with its obligations under Section 9.3.4 of the JVOA.

73. Section 9.1.1 of the JVOA states that "[a]ll withdrawals from the Special Bank Account, including those for payment to the Venturers for services performed, will require the signature or consent from a representative of *each* Venturer." (Emphasis added).

74. Despite this language in the JVOA, ELB has been making withdrawals from the Joint Venture's Special Bank Account, as defined in the JVOA, without Summit's signature or consent.

75. Moreover, Summit did not have access to or any signature authority on the JV's bank account, despite multiple requests and SBA regulations requiring as much, until mid-July 2026.

76. Although Summit now has login credentials for the Special Bank Account, Summit had to jump through all of Defendants' hoops to make this happen, including (1) providing formal notice of the appointment of William Funaro as the authorized signatory for Summit, (2) providing a consent and authorization letter removing Joseph Funaro and appointing William Funaro, which was signed by both Joseph Funaro and William Funaro, (3) executing a written consent of the members of the Joint Venture with a wet signature, (4) executing a Business Signature Card with Substitute Form W-9 with a wet signature, (5) executing a Business Signature Card Addendum with a wet signature and getting it notarized, and (6) executing a certified copy of Limited Liability Company Resolutions with a wet signature.

77. Currently, ELB still has the authority to unilaterally authorize a withdrawal from the Special Bank Account; thus there is still no dual signature authority for withdrawals as required by the JVOA and SBA regulations.

78. Additionally, ELB has been freely making withdrawals from the Special Bank Account without Summit's consent in violation of the JVOA and SBA regulations.

79. The Addendum outlines the parties' respective workshare for the Contract, stating that "[f]or the 1st Contract, the Joint Venture anticipates subcontracting less than five percent (5%). For the 1st Contract, the Managing Venturer will perform forty percent (40%) of the work performed by the Joint Venture on the 1st Contract and the Partner Venturer shall perform approximately sixty percent (60%) of the work performed by the Joint Venture on the 1st Contract, minus the five percent (5%) or less of the 1st Contract that is anticipated to be subcontracted." Ex. B, Addendum at § 7.3.2.

80. Additionally, Section 7.3.2.1 of the Addendum provides that the majority of the Contract labor will be performed by system support representatives ("SSRs"). Thus, with respect to the specific tasks the parties will perform on the Contract, ELB "will perform major contract functions including providing approximately 45% of the SSR work and the Program Management Office" and Summit "will perform approximately 55% of the SSR work, including all OCONUS [(outside of the continental United States)] SSR work, and will assist with the management work, as directed by E.L. Blake."

81. Despite the clear Addendum language calling for Summit to receive all OCONUS SSR work, in March 2026, ELB took and filled a new OCONUS SSR position (the "Lakenheath Position") that was issued under a new prime contract task order by the Agency.

82. When confronted about this clear breach of the Addendum, Coleman explained that ELB wanted the Lakenheath Position in order to have past performance working overseas.

83. Summit has repeatedly explained that ELB has breached the plain terms of the Addendum by taking the Lakenheath Position.

84. On or about August 7, 2026, ELB and Coleman agreed to transfer the Lakenheath Position back to Summit.

85. However, as of the date of this filing, neither ELB nor Coleman have taken any action to follow through on their promise to transfer the Lakenheath Position back to Summit and ELB continues to fill the position in violation of the Addendum.

86. From March 1, 2026 through July 21, 2026, Summit's employees solely provided the services and support required for the Lakenheath Position.

87. ELB filled the Lakenheath Position with its own employee on July 21, 2026, despite Summit's demands to fill the position as it is entitled to under the Addendum.

88. Despite Summit performing the attendant services for the Lakenheath Position between March 1, 2026 and July 21, 2026, Summit has not received any of the resulting revenue from the Contract.

89. Additionally, ELB, through Coleman, has indicated that it intends to keep all positions that open up at Hill Air Force Base in the future regardless of whether any of those positions are currently Summit's. For example, one of Summit's employees retired on August 31, 2026 and on September 9, 2026, ELB removed the open position from Summit's workshare.

90. ELB has taken more than the 40% of work share to which it is entitled under the Addendum.

91. Section 7.3.2.2 of the Addendum also outlines that "[t]he Partner Venturer will be responsible for all MPSC IV accounting functions until the Managing Venturer has a DCMA/DCAA approved accounting system capable of handling the other than fixed price work anticipated during the . . . Contract[,]" because the Contract required the use of a DCMA/DCAA approved accounting system.

92. Prior to the start of the Contract, ELB, through Coleman, notified Summit that it had set up a DCMA/DCAA approved accounting system for ELBS that was capable of handling the other than fixed price work anticipated during the Contract.

93. ELB, through Coleman, has handled all of the accounting for ELBS since performance of the Contract began.

94. After being notified that ELB would be providing the accounting for ELBS, rather than Summit as outlined in the Addendum, Summit requested confirmation of ELBS's DCMA/DCAA approved accounting system.

95. ELB and Coleman have refused to provide any confirmation that ELBS is actually utilizing DCMA/DCAA approved accounting system as required.

96. Upon information and belief, ELBS does not have a DCMA/DCAA approved accounting system.

97. ELB's refusal to confirm that ELBS has and is using a DCMA/DCAA approved accounting system for the Contract and takeover of ELBS's accounting functions violate Section 7.3.2.2 of the Addendum.

98. As a direct and proximate result of ELB's breaches of the JVOA and Addendum, Summit has suffered and continues to suffer substantial damages.

99. ELB's refusal to provide complete and usable books, records, financial information, tax documents, subcontracting information, invoices, payment records, workshare records and other Joint Venture records has deprived Summit of the contractual rights and protections for which it bargained as a 49% member of ELBS and has prevented Summit from monitoring, verifying, and protecting its ownership interests in the Joint Venture and the Contract.

100. ELB's failure to provide the annual financial statements, tax information, and K-1s required by Sections 9.2.4 and 9.3.4 of the JVOA has prevented Summit from timely preparing and filing its tax returns, has subjected Summit to additional accounting and professional expenses, and has exposed Summit to potential tax-related liabilities, penalties, interest, and other damages.

101. ELB's unauthorized withdrawals from the Joint Venture's Special Bank Account and failure to implement the dual-signature and joint-control requirements mandated by the JVOA and applicable SBA regulations have deprived Summit of its contractual right to participate in and approve disbursements of Joint Venture funds and have impaired Summit's ability to safeguard Joint Venture assets and protect its economic interests in the Contract.

102. ELB's assumption of work and positions contractually allocated to Summit under the Addendum, including the Lakenheath Position, has reduced Summit's participation in the Contract, deprived Summit of Contract revenue, profits, labor utilization opportunities, past-performance benefits, and other economic advantages to which Summit is entitled under the JVOA and Addendum.

103. ELB's actions have improperly increased ELB's allocated share of Contract work while correspondingly decreasing Summit's contractually promised share, thereby denying Summit the benefit of its bargain under the Addendum.

104. The Contract revenue owed to Summit in connection with the Lakenheath Position, ELB acknowledges belongs to Summit, is approximately $108,105.00 for the period March 1, 2026 through July 21, 2026 alone. Each month ELB continues to fill the Lakenheath Position in violation of the Addendum deprives Summit of an additional $21,621.00 in Contract revenue.

105. ELB's failure to comply with Section 7.3.2.2 of the Addendum and its refusal to provide information concerning the Joint Venture's purported DCMA/DCAA-approved

accounting system have impaired Summit's ability to fulfill the accounting responsibilities allocated under the Addendum, evaluate the Joint Venture's compliance with contractual and regulatory requirements, and protect itself from potential financial, contractual, and regulatory risks arising from ELB's conduct.

106. The full extent of Summit's damages cannot presently be determined because Defendants continue to withhold the books, records, financial information, and other documents required to be produced under the JVOA and Addendum.

107. The damages suffered by Summit include, but are not limited to, lost profits, lost Contract revenue, lost business opportunities, loss of bargained-for workshare, increased professional and administrative expenses, tax-related damages, and other consequential damages in an amount to be determined at trial.

108. ELB's aforementioned conduct, including withholding books, records, and financial information, making unauthorized withdrawals from the Special Bank Account, unilaterally taking workshare and positions allocated to Summit, and failing to repay the working capital loan, not only breaches specific provisions of the JVOA and Addendum but also frustrates the fundamental purposes of the parties' agreement. ELB's pattern of conduct demonstrates a systematic breach of the specific terms of the JVOA and Addendum that has deprived Summit of the benefits of its bargain as a 49% member of the Joint Venture.

109. Accordingly, Summit is entitled to recover all damages available under applicable law arising from ELB's breaches of the JVOA and Addendum, together with pre- and post-judgment interest, costs, attorneys' fees and indemnification under Section 5.7.1 of the JVOA, and such other relief as the Court deems just and proper.

**COUNT II – BREACH OF ALABAMA LLC ACT**

**(Against Defendants ELB and Coleman)**

110. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 56 above as if set forth herein.

111. Under the Alabama LLC Act, "on 10 days' notice made in a writing received by the limited liability company, the records set forth in subsection (a) above, and any other books and records of the limited liability company, wherever situated, are subject to inspection and copying for any proper purpose by any member or the member's agent or attorney during regular business hours." Ala. Code § 10A-5A-4.09(b).

112. Summit has repeatedly requested access to ELBS books and records, including task order documents, financial records, and records that would reflect the workshare between the parties and the Joint Venture's subcontractor.

113. Summit reiterated this request for access to the Joint Venture's books and records in an April 14, 2026 email to ELB. A true and correct copy of this April 14th email was attached to the Demand Letter at Exhibit C.

114. Summit has further reiterated its request for access to the Joint Venture's books and records in its May 13th Demand Letter. *See* Ex. C, Demand Letter.

115. As a 49% member of ELBS, Summit is entitled to full access to ELBS's books and records and to inspect and copy such records for purposes reasonably related to its interest as a member.

116. To date, Summit has only been provided partial responses to its repeated books and records requests.

117. As of the date of this filing, ELB has only provided incomplete and unusable financial information and the task orders issued to the Joint Venture by the Agency.

118. The first set of incomplete financial information was provided on June 2, 2026, forty-nine days after Summit's April 14th request.

119. After additional back and forth between the parties' counsel, ELB provided additional financial information and copies of the task orders issued by the Agency to ELBS on June 11, 2026—fifty-eight days after Summit's April 14th request.

120. As of the date of this filing, ELB has still not provided complete and usable financial information, including the 2025 K-1s, which has prevented Summit from filing its taxes, invoices submitted to the Agency by ELBS, an unbilled analysis, vendor payments, accounts payable open reports, and information regarding the indirect rates and cost allocation structure.

121. These requested documents and information constitute the financial statements and tax returns and reports that are required to be maintained and are subject to inspection and copying by members under the Alabama LLC Act, Ala. Code § 10A-5A-4.09(a)-(b).

122. Moreover, as both a manager and the Responsible Manager, Coleman has the authority to direct and oversee the activities and affairs of ELBS.

123. As the managing member, ELB has the authority to direct and oversee the activities and affairs of ELBS.

124. Despite Summit's right to inspect ELBS's books and records on 10 days' written notice, Coleman and ELB, without reasonable cause, refused to allow Summit to inspect and copy ELBS's books and records in violation of Ala. Code § 10A-5A-4.09(b).

125. Accordingly, Defendants may be held personally liable to Summit "for a penalty in an amount not to exceed ten percent of the fair market value of the transferable interest of the member." *See* Ala. Code § 10A-5A-4.09(b).

126. By violating the Alabama LLC Act, Defendants have deprived Summit of information necessary to monitor and protect its ownership interest in ELBS, evaluate ELBS's financial condition and operations, verify the allocation of work and revenues among ELBS, its members, and subcontractors, and determine whether ELBS has been managed in accordance with applicable law and governing agreements. Defendants' misconduct also forced Summit to incur attorneys' fees, administrative costs, and other expenditures in attempting to obtain records to which it was entitled under the Alabama LLC Act.

127. Pursuant to Ala. Code § 10A-5A-4.09(b), because Defendants, without reasonable cause, refused to permit inspection and copying of ELBS's books and records following proper demand, Defendants are liable to Summit for the statutory penalty authorized by the Alabama LLC Act in an amount not to exceed ten percent of the fair market value of Summit's transferable interest in ELBS, together with such other relief as the Court deems just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTIES
**(Against Defendants ELB and Coleman)**

128. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 56 above as if set forth herein.

129. Under Section 5.1.6 of the JVOA, the "Managers, and the Members on behalf of themselves and the Managers they appoint, owe fiduciary duties, and duties of good care and good faith and loyalty, to the Company and the Members (or the other Member, as the case may be)."

130. The Alabama LLC Act also imposes fiduciary duties on members of an LLC "with direction and oversight," including the duty of loyalty and duty of care. *See* Al. Code 10A-5A-4.08(a)(1).

131. Relevant here, the LLC Act defines the duty of care as "refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." Al. Code 10A-5A-4.08(d)(1).

132. As the managing member of the Joint Venture with direction and oversight over the Joint Venture, ELB owes fiduciary duties and duties of good care and good faith and loyalty to Summit under both the JVOA and the Alabama LLC Act.

133. Coleman, as both a manager and the Responsible Manager with direction and oversight over the Joint Venture, owes fiduciary duties and duties of good care and good faith and loyalty to Summit under both the JVOA and the Alabama LLC Act.

134. Defendants have breached these fiduciary duties, including the duty of care as defined by Ala. Code § 10A-5A-4.08(d)(1), by engaging in conduct that constitutes intentional misconduct and knowing violations of law, specifically by: (1) knowingly violating the express terms of the JVOA and Addendum regarding Summit's workshare, books and records access, and Special Bank Account requirements, (2) knowingly violating the Alabama LLC Act by refusing to permit Summit to inspect and copy ELBS's books and records as required by Ala. Code § 10A-5A-4.09(b); (3) knowingly violating SBA regulations regarding the Joint Venture's Special Bank Account by making withdrawals without the required dual-signature authorization, (4) intentionally failing to repay the working capital loan in accordance with the parties' agreement despite receiving Contract revenues sufficient to do so, (5) intentionally diverting workshare and positions on the Contract that the Addendum allocates to Summit, including the Lakenhealth Position and all OCONUS SSR work; (6) upon information and belief, utilizing an accounting system for ELBS that has not been approved by the DCMA/DCAA as required by the Contract, thereby knowingly operating in noncompliance with federal contract requirements; and (7) upon

information and belief, grossly negligently, recklessly, or intentionally mismanaging the Joint Venture's financials and operations.

135. Additionally, Defendants have breached the duty of loyalty as defined by Ala. Code § 10A-5A-4.08(b) by appropriating Joint Venture opportunities, workshare, and Contract revenue for ELB's own benefit to the detriment of Summit.

136. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Summit has suffered substantial damages. Defendants' conduct deprived Summit of the benefits of its bargain under the JVOA and Addendum, including Summit's contractual right to receive its agreed-upon share of work, revenue, profits, management participation, and economic opportunities arising from the Joint Venture's performance of the Contract.

137. By improperly diverting workshare, positions, and other Joint Venture opportunities to themselves, failing to administer the Joint Venture in accordance with the governing agreements and applicable law, failing to properly manage Joint Venture funds and financial affairs, and failing to repay the Joint Venture's working-capital obligations as agreed, Defendants diminished the value of Summit's ownership interest in the Joint Venture and caused Summit to suffer lost profits, lost business opportunities, reduced distributions, increased liabilities, out-of-pocket losses, and other consequential damages in an amount to be proven at trial.

138. The damages suffered by Summit were the foreseeable and natural consequence of Defendants' breaches and were caused directly by Defendants' wrongful conduct. Summit therefore seeks recovery of all compensatory damages available under Alabama law, together with equitable relief, disgorgement, prejudgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT IV – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(Against Defendants ELB and Coleman)**

139. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 56 above as if set forth herein.

140. The Addendum outlines the parties' respective workshare for the Contract, stating that "[f]or the 1st Contract, the Joint Venture anticipates subcontracting less than five percent (5%). For the 1st Contract, the Managing Venturer will perform forty percent (40%) of the work performed by the Joint Venture on the 1st Contract and the Partner Venturer shall perform approximately sixty percent (60%) of the work performed by the Joint Venture on the 1st Contract, minus the five percent (5%) or less of the 1st Contract that is anticipated to be subcontracted." Ex. B, Addendum at § 7.3.2.

141. Additionally, Section 7.3.2.1 of the Addendum provides that the majority of the Contract labor will be performed by system support representatives ("SSRs"). Thus, with respect to the specific tasks the parties will perform on the Contract, ELB "will perform major contract functions including providing approximately 45% of the SSR work and the Program Management Office" and Summit "will perform approximately 55% of the SSR work, including all OCONUS [(outside of the continental United States)] SSR work, and will assist with the management work, as directed by E.L. Blake."

142. Despite the plain language of the Addendum, ELB, through Coleman, has taken the position that the parties' workshare under the Addendum is overall 45% to ELB and 55% to Summit, not 40% to ELB and 60% to Summit as stated in Section 7.3.2 of the Addendum.

143. Not only is this ELB and Coleman's stated position but both have begun taking actions to execute their flawed interpretation of the Addendum by taking the Lakenheath Position and indicating that ELB will fill any future open positions on the Contract.

144. Summit has not waived and continues to strenuously object to Defendants' interpretation of the Addendum with respect to workshare, the taking of the Lakenheath Position, and ELB's plans to fill future open positions on the Contract. This workshare dispute alone far exceeds the amount in controversy threshold for conferring subject matter jurisdiction in this Court.

145. Section 9.1.1 of the JVOA states that "[a]ll withdrawals from the Special Bank Account, including those for payment to the Venturers for services performed, will require the signature or consent from a representative of each Venturer."

146. Despite this language in the JVOA, ELB has been making withdrawals from the Joint Venture's Special Bank Account, as defined in the JVOA, without Summit's signature or consent.

147. While currently either ELB or Summit has the authority to authorize a withdrawal from the Special Bank Account, there is no dual signature or consent mechanism for withdrawals as required by the JVOA and SBA regulations, and notwithstanding Summit's repeated requests for compliance.

148. ELB, through Coleman, has indicated that the arrangement at present is sufficient to satisfy the JVOA and SBA regulations.

149. Notably, ELB, through Coleman, denied Summit's request to include a dual signature requirement for withdrawals from the Special Bank Account in the Joint Venture's new invoicing policy.

150. In contrast, Summit continues to assert its right to either sign off on or consent to any withdrawals from the Special Bank Account in accordance with the JVOA and SBA regulations.

151. Thus, an actual controversy exists between the parties concerning their respective rights and obligations under the JVOA and Addendum.

152. A contract may be construed either before or after there has been a purported breach thereof. *See* 28 U.S.C. § 2201; FED. R. CIV. P. 57.

153. Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. The overall workshare under the Addendum is 40% to ELB and 60% to Summit as stated in Section 7.3.2 of the Addendum;

b. Summit is entitled to fill Lakenheath Position; and

c. The JVOA requires that Summit must consent to or sign off on all withdrawals from the Special Bank Account.

154. The declaratory relief sought will determine the parties' rights and obligations under the JVOA and Addendum, which has a value far exceeding $75,000.00, as the revenue resulting from the Lakenheath Position alone exceeds $75,000.00.

155. The Court should also issue corresponding injunctive relief requiring Defendants to act in accordance with these declarations, by ordering Defendants to:

a. Transfer the Lakenheath Position to Summit by a date certain;

b. Seek Summit's consent or signature for every withdrawal from the Special Bank Account;

c. Provide full and complete access to the Joint Venture's books and records by a date certain;

d. Provide a full and complete accounting of ELBS completed by an independent third-party auditor and/or forensic accountant by a date certain;

e. Comply with all applicable SBA regulations; and

f. Comply with the JVOA and Addendum.

156. If an injunction is not issued, Summit will suffer irreparable injury and lack an adequate legal remedy because Summit will be forced to bring multiple lawsuits to rectify the same misconduct. Simply put, monetary damages, while warranted based on the above, do not cover the full extent of injuries suffered by Summit, including damages that are not entirely quantifiable, such as: (1) the ongoing loss of past performance credit with the Air Force that cannot be recaptured; (2) the continued erosion of Summit's workshare and contractual position on the Contract with each passing day; (3) exposure to potential regulatory noncompliance with SBA regulations; and (4) reputational harm with the Agency that monetary damages cannot remedy.

157. The hardship to Summit if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued.

158. Issuance of the requested injunction will serve the public interest by ensuring compliance with contractual obligations and SBA regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Summit respectfully requests that this Court enter a judgment for Plaintiff and award the following relief:

a. Order Defendants, by a date certain, to respond in full to Summit's books and records demand and produce all available information requested;

b. Order Defendants, by a date certain, to provide a full and complete accounting of ELBS completed by an independent third-party auditor and/or forensic accountant;

c. Find and declare that Defendant ELB breached the Joint Venture Operating Agreement and Addendum;

d. Find and declare that Defendant ELB's pattern of conduct in withholding books and records, making unauthorized withdrawals, and diverting Summit's workshare constitutes a breach of the specific terms of the JVOA and Addendum;

e. Find and declare that ELB and Coleman violated the Alabama LLC Act and are liable to Summit for the statutory penalty provided for in Ala. Code § 10A-5A-4.09(b);

f. Find and declare that Defendants ELB and Coleman breached their fiduciary duties to Plaintiff;

g. Find and declare that:

   i. The overall workshare under the Addendum is 40% to ELB and 60% to Summit as stated in Section 7.3.2 of the Addendum; and

   ii. The JVOA requires that Summit must consent to or sign off on all withdrawals from the Special Bank Account;

h. Enter a permanent injunction ordering Defendants to:

   i. Transfer the Lakenheath Position to Summit;

   ii. Seek Summit's consent or signature for every withdrawal from the Special Bank Account as required under applicable SBA regulations;

   iii. Provide full and complete access to the Joint Venture's books and records;

   iv. Comply with all applicable SBA regulations; and

   v. Comply with the JVOA and Addendum;

i. Enter judgment against Defendants, in an amount no less than $250,000.00 (or such greater amount to be proven at trial), plus reasonable attorney's fees and court costs; and

j. Grant Plaintiff such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: September 25, 2026

/s/ Caleb W. Diaz
CALEB W. DIAZ
**ADAMS AND REESE, LLP**
11 North Water Street, Suite 23200
Mobile, Alabama 36602
(251) 650-0893
Caleb.diaz@arlaw.com

Todd M. Reinecker (*pro hac vice* forthcoming)
**PILIEROMAZZA PLLC**
60 West Street, Suite 201
Annapolis, MD 21401
Tel: (410) 500-5551
Fax: (202) 857-0200

*Attorneys for Summit Technologies, Inc.*

**PLAINTIFF TO SERVE DEFENDANTS AT THE FOLLOWING:**

E.L. Blake, Inc.
1401 Fall Branch Drive
Phenix City, Alabama 36867

Ernest Coleman
1401 Fall Branch Drive
Phenix City, Alabama 36867